[L. A. No. 25494. In Bank. July 20, 1961.]

THEODORE R. GABRIELSON, Petitioner and Appellant, v. CITY OF LONG BEACH, Defendant and Respondent; PEOPLE OF THE STATE OF CALIFORNIA, Intervener and Respondent.*

*This case was originally entitled, "Mallon v. City of Long Beach."

John W. Preston, John W. Preston, Jr., S. V. O. Pritchard and Peter E. Giannini for Petitioner and Appellant.

Gerald Desmond and Walhfred Jacobson, City Attorneys, O'Melveny & Myers and Pierce Works for Defendant and Respondent.

Stanley Mosk, Attorney General, Howard S. Goldin, Assistant Attorney General, and Jay L. Shavelson, Deputy Attorney General, for Intervener and Respondent.

TRAYNOR, J.—In 1911 the State of California granted to the city of Long Beach the tidelands and submerged lands lying within the city's boundaries in trust for certain uses and purposes connected with the development of Long Beach Harbor. (Stats. 1911, ch. 676, p. 1304.) The terms of the original trust were amended by the Legislature in 1925 (Stats. 1925, ch. 102, pp. 235-236) and 1935 (Stats. 1935, ch. 158, pp. 793-795). Following the discovery of oil under the tidelands in 1937, it was determined in *City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362], that the city had the right to produce oil and gas from these lands, and in *City of Long Beach* v. *Morse,* 31 Cal.2d 254 [188 P.2d 17], and *Trickey* v. *City of Long Beach,* 101 Cal.App.2d 871 [226 P.2d 694], that the oil and gas revenue could be used only

for trust purposes. In 1951 the Legislature found that 50 percent of the revenue derived from the production of oil, gas, and other hydrocarbons other than dry gas and all of the revenue derived from the production of dry gas were no longer needed for trust purposes and declared such revenues free from the public trust for navigation, commerce, and fisheries. (Stats. 1951, ch. 915, pp. 2444-2445.)

The city claimed the released revenues and undertook to expend them for general municipal purposes. Felix Mallon, a taxpayer of the city, then brought an action to enjoin the city from expending the released revenues other than dry-gas revenues for other than trust purposes on the ground that the 1951 statute releasing the revenues from the trust was unconstitutional. Mrs. Alma Swart, another taxpayer of the city, intervened. Through her attorney, Theodore R. Gabrielson, she alleged that Mallon was prosecuting a friendly suit and that he had failed to raise the question of the unlawful expenditure of dry-gas revenues and other important legal and constitutional issues. She sought to enjoin the expenditure of any of the released revenues for other than trust purposes. Although she joined in Mallon's attack on the constitutionality of the 1951 statute, she also contended that if the statute were to be held constitutional, it would be necessary to interpret it as releasing the oil and gas revenues to the state rather than to the city.

The trial court held that the statute released the revenue to the city and entered judgment for it. Both Mallon and Mrs. Swart appealed. Although she agreed with Mallon's contention that the Legislature could not constitutionally release the revenues to the city, Mrs. Swart also presented the contention, accepted by the court, that the statute was a valid partial revocation of the trust that necessarily resulted in a reversion to the state of the released revenues, which the city held upon a resulting trust for the state. (*Mallon* v. *City of Long Beach*, 44 Cal.2d 199, 212 [282 P.2d 481].)

Although the attorney general was aware of this litigation, he took no part in it until after the decision of this court, when he filed an amicus curiae brief urging that a rehearing be denied. Thereafter the state brought an action against the city to recover the funds to which it was entitled under the decision in the Mallon case. In 1956 the Legislature took note of this litigation and concluded that the public interest would best be served by its prompt settlement. Accordingly, it authorized a settlement dividing the oil and gas revenue

between the state and the city and provided that the latter's share should continue to be held in trust and expended for trust purposes. (Stats. 1st Ex. Sess. 1956, ch. 29.) Pursuant to this legislation a consent decree was entered settling the main points of dispute between the city and the state.

On March 27, 1956, petitioner Gabrielson filed a petition in the Mallon case for attorney's fees for establishing the state's right to the released revenues. The city resisted his application as trustee and the state intervened as beneficiary of the resulting trust. Following an extended hearing, the trial court entered its judgment denying an award of attorney's fees. Petitioner appeals.

Petitioner contends that his legal efforts as attorney for Mrs. Swart secured for the state oil and gas revenues stipulated to be worth $200,000,000 and that therefore he is entitled to reasonable attorney's fees from this fund. He points out that the attorney general and other state officials shared the view that the Legislature intended to release the surplus oil and gas revenues to the city and took no action to protect the state's right thereto until after he had successfully represented the state's interest before this court.

Although petitioner seeks fees from funds in the hands of the city as trustee, the city and state contend that his suit is nevertheless an action against the state to which it has not consented. They also contend that petitioner is not entitled to attorney's fees on the ground that he abandoned the interests of the city taxpayers he purported to represent when he advanced the state's interest against those taxpayers. Finally they assert that petitioner was properly denied fees on the ground that both his and Mrs. Swart's purpose in intervening was to defeat both the state's and city's interests by tying up the revenues in litigation until they could establish personal interests therein under federal mineral leasing applications.

Before this proceeding was tried, the city and state unsuccessfully sought a writ of prohibition in the District Court of Appeal, and a hearing was denied in this court. Petitioner contends that the denial of the application for the writ, even though no opinion was filed, is res judicata with respect to the defense of sovereign immunity and that in any event that defense is not applicable in this case. He also asserts that he did not abandon the interests of the city taxpayers on whose behalf he intervened. He points out that it is always to the taxpayers' interest that money not be spent illegally,

and that given the determination that the oil and gas revenues could not constitutionally be released to the city, it was to the city taxpayers' interest as citizens of the state that the money be released to the state instead of being accumulated for trust purposes for which it could not economically be expended. Finally he contends that there is no evidence to support the trial court's findings that he and Mrs. Swart were endeavoring to secure the revenues for themselves.

█ In *Estate of Stauffer,* 53 Cal.2d 124, 132 [346 P.2d 748], we stated: "The bases of the equitable rule which permits surcharging a common fund with the expenses of its protection or recovery, including counsel fees, appear to be these: fairness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses; correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery; encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper litigation for the protection or recovery of the fund if he is assured that he will be promptly and directly compensated should his efforts be successful." (See also *Sprague* v. *Ticonic Bank,* 307 U.S. 161, 164-167 [59 S.Ct. 777, 83 L.Ed. 1184]; Hornstein, *Counsel Fee Awards,* 69 Harv. L. Rev. 658, 662-663.) These considerations are not apposite, however, if the attorney's and his client's ultimate objective is not to secure or preserve a common fund but to establish personal adverse interests therein. In such a case fees may not be awarded. (*Scott* v. *Superior Court,* 208 Cal. 303, 307 [281 P. 55]; *Stratton* v. *City of Long Beach,* 188 Cal.App.2d 761, 769, 771 [11 Cal.Rptr. 8]; *Hobbs* v. *McLean,* 117 U.S. 567, 581-582 [6 S.Ct. 870, 29 L.Ed. 940]; *McCormick* v. *Elsea,* 107 Va. 472 [59 S.E. 411, 412-413]; see also *State* ex rel. *Ebke* v. *Board of Educational Lands & Funds,* 159 Neb. 79 [65 N.W.2d 392, 402]; *Miller* v. *Kehoe,* 107 Cal. 340, 343-344 [40 P. 485]; Note, 49 A.L.R. 1149, 1159-1161.) Litigation so motivated calls for no added incentive in the form of fees from the common fund should the ultimate objective fail. █ Moreover, to allow them in such a case merely because the attorney's services have benefited the class to whom the fund belonged would place his interests in conflict with those of his client. An attorney retained to recover or protect a common fund so that it would be available when

and if his client could establish an adverse right thereto might be induced to forsake his client's interest in the hope of securing more substantial fees from the common fund. Thus, if the evidence supports the trial court's finding that petitioner's and Mrs. Swart's purpose in intervening was to defeat both the state's and the city's interests, the judgment must be affirmed even though their ultimate objective was not achieved and petitioner's services were therefore of benefit to the state.

In 1939 Mrs. Swart filed an application with the United States Land Office to secure an oil and gas lease of 640 acres of submerged land pursuant to the federal Mineral Lands Leasing Act of February 25, 1920, as amended (30 U.S.C.A. §§ 181 et seq.). At about the same time Earl G. Sinclair and Lauren D. Cherry filed a similar application for a lease of an adjacent 640-acre parcel. These parcels were part of the submerged lands granted to the city by the state in 1911 from which the city is and has been producing oil and gas. In 1947 the United States Supreme Court decided that the United States and not the State of California had paramount rights in the marginal seas bordering the state including full dominion over mineral resources. (*United States* v. *California,* 332 U.S. 19 [67 S.Ct. 1658, 91 L.Ed. 1889].) In 1948 the Department of the Interior rejected the Swart and Sinclair-Cherry applications, and the applicants brought actions in the District of Columbia against Secretary of the Interior Krug to compel him to grant their applications.

In 1948 Mrs. Swart transferred her application to the Alma Petroleum Corporation, and Sinclair and Cherry transferred their application to the Cherry Petroleum Corporation. These applications were the only assets of the respective corporations. Petitioner purchased several shares of Cherry Petroleum stock and received about 25 shares of Alma Petroleum stock, apparently for services rendered to Mrs. Swart, and he became an officer and director of both corporations. He was aware of the Washington litigation, which was being conducted by an attorney with whom he shared offices and Washington counsel. The Washington actions were dismissed and refiled against Secretary of Interior Chapman, Secretary Krug's successor, in 1951.

In 1952 the Washington actions were placed off calendar pending decision by the United States Supreme Court of the boundary between inland waters and the marginal seas along the California coast. The following year Congress enacted the Submerged Lands Act of 1953 (43 U.S.C.A. §§ 1301 et seq.)

quitclaiming the three-mile belt of submerged lands to the State of California and to those entitled thereto under California law. Section 8 of the act provided, however, that it did not affect rights in submerged lands that had previously been acquired under any law of the United States. In 1954 in *Justheim* v. *McKay*, 123 F.Supp. 560, the United States District Court of the District of Columbia pointed out that this provision would protect any rights that applicants for federal leases might have in the submerged lands of the United States, but it held that the Mineral Lands Leasing Act of February 25, 1920 did not apply to submerged lands. In January 1956 this holding was affirmed by the United States Court of Appeals (*Justheim* v. *McKay*, 229 F.2d 29) and in May the United States Supreme Court denied certiorari. (*Justheim* v. *McKay*, 351 U.S. 933 [76 S.Ct. 789, 100 L.Ed. 1461].) In August the Swart and Cherry-Sinclair actions were dismissed pursuant to stipulation on the basis of the decision in the Justheim case.

Petitioner filed Mrs. Swart's complaint in intervention in the Mallon case in 1953 and argued the appeal before this court in 1954. After our decision in 1955, he resisted the petition for rehearing and continued to represent the state's interest in subsequent proceeding in the Mallon case until after the settlement of the controversy between the city and state pursuant to the 1956 legislation.

From the foregoing evidence the trial court could reasonably infer, as it did, that "The ultimate objective of petitioner . . . [and Mrs. Swart] was to deprive the City of Long Beach and the State of California of all title to and interest in the oil and gas contained in the Long Beach submerged lands covered by the respective federal leasing applications held by Alma Petroleum Corporation and Cherry Petroleum Corporation and to establish said corporations' ownership of the oil and gas revenues therefrom. The intervention of . . . [Mrs. Swart and petitioner] was intended by [them] . . . as a step to accomplish said objective, the real purpose thereof being to prevent expenditure of oil and dry gas revenues derived by the City of Long Beach from the submerged lands covered by said mineral leasing applications until such time as said applications were granted and leases issued thereon by the Secretary of the Interior."

 Petitioner contends, however, that in the light of other evidence in the record no inference can be drawn from the mere pendency of the Washington litigation that he and

Mrs. Swart were still seeking to establish personal interests in the oil and gas revenues at the time she intervened in the Mallon case. Thus, petitioner testified that he concluded and so advised Mrs. Swart that any federal rights were gone following the Republican victory in the election of 1952, which paved the way for the return of the submerged lands to the states the following year. He then threw away his Alma Petroleum stock and wrote off his Cherry Petroleum stock as a total loss on his income tax return. Mrs. Swart took no action to prosecute her Washington action after it was put off calendar in 1952, and at no time did petitioner take part in the Washington litigation. Had he believed that there was any chance of establishing the federal rights after the submerged lands were returned to the state, he contends that it would have been totally out of character for him, who showed such tenacity in prosecuting the Mallon case, to allow his interests in the federal applications to be handled by others and ultimately to be defeated in the Justheim case, with which he had no connection. Moreover, he asserts that had he wished to preserve the oil and gas revenues intact, he would not have advanced the contention that they had been released to the state.

It is true that the evidence would support a finding that petitioner and Mrs. Swart had abandoned the federal claims before the intervention in the Mallon case and that they entered that case solely for the purpose of insuring that the oil and gas revenue should be lawfully expended. It was for the trial court, however, to resolve conflicting inferences and determine the weight that should be given to petitioner's disclaimer of any adverse interest. Unfortunately much evidence of Mrs. Swart's and petitioner's objectives was unavailable. Mrs. Swart was too senile to appear as a witness, and her husband could shed no light on the advice petitioner had given her. Petitioner's office associate who was cocounsel of record in the Mallon case and cocounsel with Washington attorneys in the Swart and Cherry-Sinclair Washington litigation died suddenly before being called to testify.

There was testimony, however, that in 1955 petitioner had stated to the witness that in his opinion the United States was the owner of the lands from which the oil and gas revenues were derived, and it is significant that from 1949 to 1951 petitioner, together with the counsel who had filed the Washington actions, prosecuted the case of *Trickey* v. *City of Long Beach*, 101 Cal.App.2d 871 [226 P.2d 694], to enjoin the

city from spending dry-gas revenues for nontrust purposes. At that time petitioner had not concluded that the federal claims were valueless, and in view of the saving clause for federal rights included in the Submerged Lands Act of 1953, the trial court could reasonably infer that petitioner did not consider that act conclusive. It may be that the chance of establishing the federal claims appeared remote, but the stakes were tremendous. Petitioner had made an intensive study of the law governing the tide and submerged lands, he was familiar with the pleadings in the Swart and Cherry-Sinclair Washington actions and he had studied the records of the United States Supreme Court in the proceedings between the United States and California. It was only after the decision in the Justheim case that the Swart and Cherry-Sinclair actions were dismissed, and there is no compelling evidence that they had theretofore been abandoned. The trial court was fully justified in concluding that they had not been abandoned when petitioner prosecuted Mrs. Swart's intervention in the Mallon case and that the purpose of intervention was to protect the value of the federal claims when and if they should be established.

 Petitioner contends that the trial court committed prejudicial error in excluding evidence of his services before a committee of the Legislature in working out legislation to settle the controversy that arose between the city and the state after the Mallon case was decided. He contends that this evidence was relevant to prove that his motive throughout was not to defeat but to protect the state's interest. It is clear from the record that in excluding this evidence the trial court was primarily concerned with the extent of services for which fees could be awarded if the right to fees was established. It had ruled that only services rendered in the Mallon case itself could be considered in fixing the amount of compensation, and it concluded that services volunteered to the Legislature to assist in securing the fruits of the Mallon decision for the state could not be compensated. It is true that petitioner stated that he was offering the evidence not only on the question of the amount of the fees that should be awarded but also to establish the equities of his case. He did not point out, however, the relevance of the evidence to the issue of his motive. Moreover, since he had attacked the effectiveness of the attorney general's representation of the state's interest even after the Mallon case was decided and had contended that the attorney general failed properly to repre-

234

sent the state before the committee of the Legislature, the equities he referred to could easily have been understood to relate to a right to compensation for all services rendered in the state's interest whether within or outside of the framework of the Mallon case. Even if the trial court erred in failing to see the relevance of the excluded evidence to the issue of petitioner's motive or that it was offered on that issue, the error was not prejudicial. There was abundant evidence in the record that petitioner continued to champion the state's interest in the Mallon case itself following this court's decision therein, and evidence of similar activity before the Legislature would have been largely cumulative. Under these circumstances it is not reasonably probable that had the trial court admitted the offered evidence, it would have resolved the question of petitioner's motive differently than it did.

The judgment is affirmed.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied August 16, 1961.